Florencio REYES, M.D., Plaintiff,

v.

WILSON MEMORIAL HOSPITAL,
et al., Defendants.

No. C–3–93–187.

United States District Court,
S.D. Ohio,
Western Division.

Sept. 21, 1998.

**800**

Firooz Taghi Namei, McKinney & Namei Co. LPA, Cincinnati, OH, for Florencio Reyes, MD, plaintiff.

Neil Frank Freund, Freund Freeze & Arnold, Dayton, OH, Robert Forrest Cowdrey, Jenks, Surdyk & Cowdrey Co., Dayton, OH, Stanley Robert Evans, Sidney, OH, for Wilson Memorial Hospital, defendant.

Robert Forrest Cowdrey, Jenks, Surdyk & Cowdry Co., Dayton, OH, for Bruce Urbanc, Michael Stark, Philip Edwards, Fred R. Haussman, Randall Welsh, Enrique C. Montana, defendants.

DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. # 77); SAID MOTION SUSTAINED IN REGARD TO COUNTS THREE AND SEVEN; SAID MOTION SUSTAINED IN REGARD TO CLAIMS FOR DAMAGES ARISING IN COUNTS ONE, FIVE, SIX, AND EIGHT, TO THE EXTENT SAID CLAIMS ARE PREMISED ON ACTIVITIES RELATING TO A PROFESSIONAL REVIEW ACTION; SAID MOTION SUSTAINED IN REGARD TO THE CLAIM FOR DAMAGES CONTAINED WITHIN COUNT FOUR, TO THE EXTENT SAID CLAIM ARISES UNDER ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION; SAID MOTION OVERRULED IN REGARD TO PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF, TO THE EXTENT SAID REQUEST DOES NOT ARISE UNDER COUNTS THREE OR SEVEN; SAID MOTION OVERRULED IN REGARD TO FEDERAL CONSTITUTIONAL CLAIMS CONTAINED WITHIN COUNTS TWO AND FOUR; SAID MOTION OVERRULED IN REGARD TO CLAIM FOR DAMAGES IN COUNTS ONE, FIVE, SIX, AND EIGHT, TO THE EXTENT SAID CLAIMS DO NOT RELATE TO PROFESSIONAL REVIEW ACTIONS; PLAINTIFF'S MOTION TO EXTEND TIME FOR ADDITIONAL DISCOVERY (DOC. # 85) OVERRULED; CONFERENCE CALL SET

RICE, Chief Judge.

This case arises from circumstances surrounding the restriction of the staff privileges of the Plaintiff, Dr. Florencio Reyes, at Defendant Wilson Memorial Hospital in April, 1992; the subsequent summary sus-

pension of his privileges; and the alleged breach of a later agreement reached between the Plaintiff and the Hospital. In his Complaint (Doc. # 1), Plaintiff brings suit against the Hospital and six physicians, each of whom practices at the Hospital: Bruce Urbanc, D.O.; Michael Stark, D.O.; Phillip Edwards, D.O.; Fred R. Haussman, M.D.; Randall Welsh, M.D.; and Enrique C. Montana, M.D.

Plaintiff alleges the following claims for relief: conspiracy to wrongfully deprive Plaintiff of his medical practice, in violation of the Sherman Anti–Trust Act, as codified at 15 U.S.C. §§ 1 *et seq.* (Count One); deprivation of his property right to membership on the Hospital's staff, in violation of the Fourteenth Amendment to the United States Constitution (Count Two); state-law claims of breach of contract and promissory estoppel (Counts Three and Seven); deprivation of his right to due process, in violation of the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, § 16 of the Ohio Constitution (Count Four); state-law claims of tortious interference with contract and business relationships (Counts Five and Eight); and a state-law claim of defamation (Count Six).[1]

This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over the federal claims asserted in Counts One, Two and Four. The Court may properly exercise its supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over the state-law claims alleged in Counts Three, Four, Five, Six, Seven and Eight, as these claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

Pending before the Court are two Motions. *First*, the Defendants have filed a Motion for Summary Judgment (Doc. # 77), by which they seek the dismissal of all of the Plaintiff's claims against them on

the grounds that they enjoy an immunity to damages from the Plaintiff's claims pursuant to the Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11101–11152. *Second*, the Plaintiff has filed a Motion for Additional Time to Conduct Discovery Pursuant to Rule 56(f) (Doc. # 85).

Because the resolution of the Plaintiff's Rule 56(f) Motion turns upon legal aspects of the Defendants' Motion for Summary Judgment, the Court will first discuss the background law. The Court then analyzes the merits of the Defendants' Motion. For the reasons set forth below, the Court determines that the Defendants' Motion for Summary Judgment is meritorious, at least in part, based on the present state of the record. The Court then examines the Plaintiff's Motion to determine whether the evidence sought by the Plaintiff would alter the record such that a different result would be reached on the merits of the Defendants' Motion, and to determine whether the Plaintiff should otherwise be permitted the extension of time requested in his Motion. Again, for reasons set forth below, the Court determines that Plaintiff is not entitled to such an extension of time.

I. *Standard for Summary Judgment*

The Court will first set forth the relative burdens of the parties once a motion for summary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of

---

1. As the Court observed in a previous Entry, the Plaintiff's Ninth Count—which requests certain injunctive relief—does not constitute a

separate legal claim for relief (Doc. # 68 at 2 n. 1).

"the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. *See also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial.") (quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law under Fed.R.Civ.P. 50. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See also Michigan Protection and Advocacy Service, Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff"). Rather, Rule 56(e) "requires the non-moving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir.1992). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2726.

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). *See also, L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.,* 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 n. 7 (5th Cir.) ("Rule 56 does not

impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ...."), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

## II. *Background Facts*

The following facts are taken from the properly authenticated evidentiary submissions of the parties. Because the case is before the Court on Defendants' Motion for Summary Judgment, the Court will resolve all evidentiary disputes in favor of the Plaintiff, will grant him all reasonable inferences from the evidence, and will otherwise construe all of the evidence most strongly in his favor.

The Plaintiff, Dr. Florencio Reyes, has been a medical doctor with staff privileges at Defendant Wilson Memorial Hospital in Sidney, Ohio for many years (Verified Complaint at ¶¶ 11–12). At all relevant times, he was the only board-certified physician practicing internal medicine and primary care at Wilson Memorial (*id.* at ¶ 12). Plaintiff has had a successful practice in Sidney, and has had contracts with several nursing homes in the area (*id.* at ¶¶ 13–14).

Nevertheless, questions had been raised about the quality of the Plaintiff's care, beginning in 1989 (*e.g.,* Letter from Thomas D. Stevenson to Plaintiff, of April 13, 1989, (Doc. # 77, Exh. 1–C)). It was at this time that Peer Review Systems, Inc., became involved with the Plaintiff's practice. This entity "provided retrospective quality reviews of care provided to medicare beneficiaries and was selected as Medicare's Peer Review Organization for the State of Ohio" (Defendants' Motion at 17). During 1990, Peer Review Systems contacted Plaintiff four times to notify him that it had detected quality lapses by him in his treatment of patients (Letters to Plaintiff (Doc. # 77, Exhs. 1–D, 1–E, 1–F, and 1–G)).

At the end of October of 1990, Plaintiff was advised that Peer Review Systems would begin monitoring the Plaintiff's patients who were admitted to the Hospital (Doc. # 77, Exh. 1–G). The decision to conduct this monitoring came after Peer Review Systems was notified of a second Level III quality variance (*id.*). In other words, it was the second time that year that Plaintiff's care had been observed to deviate so far from the proper standard of care that it could be said that the Plaintiff's care had "significant adverse effects on the patient" (Peer Review Systems Explanation of Pro Quality Review (Doc. # 77, Exh. B)).

By letter dated October 16, 1990, Plaintiff was apprised of the results of the monitoring (Doc. # 77, Exh. I). Concerns were raised on two fronts: with his medical judgment and with his recorded documentation of patients' cases (*id.*). Despite this warning, such incidents continued. In late 1991, Plaintiff and the Hospital were notified by Peer Review Systems that Plaintiff continued to exhibit deficient performance. Specifically, Peer Review Systems charged that Plaintiff's documentation was still poor (*id.* at Exh. J) and that he was performing unnecessary medical procedures (*id.* at Exh. K).

On the night of April 7, 1992, one of Plaintiff's patients, Alfred Sale, was admitted to the Emergency Room at Wilson Memorial (Reyes Affidavit at ¶ 35). He was treated by an Emergency Room physician and diagnosed with aspiration pneumonia, chronic obstructive pulmonary disease (COPD) (*id.* at ¶ 35). Sale had been Plaintiff's patient for over ten years, and had a history of COPD and a heart condition (*id.* at ¶ 36). Over the next couple of days, Plaintiff was contacted periodically

by a nurse in the Intensive Care Unit regarding Sale's condition.

In the early morning hours of April 9, a nurse, Louisa Henschen, contacted Plaintiff and informed him of Sale's condition, which was apparently declining (*id.* at ¶ 41; Affidavit of Louisa Henschen at ¶ 31 (attached to Hearing Officer's Report (Doc. # 77, Exh. 2–A))). Plaintiff was aware that Sale and his family did not wish for "heroic measures" to be taken to save Sale; accordingly, he ordered the nurse to decrease the oxygen supplied to Sale and then to remove it altogether, to see whether Sale could breathe on his own (Reyes Aff. at ¶¶ 42–43). This was done as an alternative to intubation, according to Plaintiff (*id.* at ¶ 43).

These instructions "seemed inappropriate" to the nurse (Henschen Aff. at ¶ 41). Had she followed these instructions (*i.e.*, had she disconnected Sale's oxygen), she believes it would have caused the patient's death (*id.* at ¶ 46.) She reported the Plaintiff's instructions to her supervisor who, in turn, called Dr. Martin Meyers, the emergency services physician on duty at the time (*id.* at ¶ 42). Dr. Meyers arrived shortly thereafter and examined the patient and his recent records (Meyers Affidavit at ¶¶ 12–17, attached to Hearing Officer's Report (Doc. # 77, Exh. 2–A)). Dr. Meyers was apprised of the Plaintiff's instruction to discontinue the patient's oxygen (*id.* at ¶ 18). Dr. Meyers did not follow this instruction, however, because he believed it would have endangered the "safety" and "well-being" of the patient

(*id.* at ¶¶ 22–23). Accordingly, he performed the intubation on the patient.

Plaintiff was unaware, at that time, that his instructions had been disregarded and that anything unusual had occurred after his last conversation with the nurse. That afternoon, however, after he arrived at work, he was advised that a meeting was scheduled for that evening and that Plaintiff would have to attend (Reyes Aff. at ¶ 45). He was not apprised of the purpose of the meeting, however, and attended it without any knowledge of what was to transpire (*id.* at ¶¶ 45–46).

As it turned out, the meeting was called to discuss the Plaintiff's treatment of Sale. Present at the meeting, in addition to the Plaintiff, were Defendant Montana, Defendant Urbanc, Defendant Haussman, and Elizabeth Custis, the Hospital's Vice–President for Quality Management (Custis Transcript (Doc. # 77, Exh. 1–L)). The three doctors comprised the Hospital's Executive Committee. According to the minutes of the meeting,[2] the Plaintiff was questioned about his treatment of Sale and that of another patient, Vivian Martz, who was also alleged to have received poor care from the Plaintiff. It was alleged that the Plaintiff's care of this other patient, in February, 1992, had caused injury to that patient. With respect to Sale, Plaintiff responded that the actions he took were in accordance with the wishes of Sale and his family that no heroic measures be taken to save Sale's life. Defendant Montana responded to the Plaintiff's explanation by stating that patients who are not to be resuscitated must be so designated in their

2. Within the body of his Memorandum in Opposition (Doc. # 87), Plaintiff notes that "[w]hat was said at the Hearing is in dispute." (Doc. # 87 at 7). While the Memorandum continues in this vein ("Dr. Reyes continues to disagree that the minutes accurately reflect what transpired ..."), there is neither an affidavit to this effect nor a specific challenge to aspects of the minutes. Moreover, there is no challenge to the admissibility of the minutes into evidence.

To the extent that the Plaintiff has submitted evidence that runs counter to the rendition of events as spelled out in the minutes (through his testimony in his affidavit or deposition or otherwise), the Court will determine that there exists a factual dispute, and will credit the Plaintiff's version of events. This is in keeping with the Court's obligation to credit a non-moving party's evidence when analyzing a motion for summary judgment. However, where the Plaintiff has not specifically challenged the accuracy of the contents of the minutes, the Court will rely upon the version of events recited therein.

record and that Plaintiff had failed to make such a designation in Sale's record.

The doctors told Plaintiff that, in light of these events, a co-admitting physician would be required for all of Plaintiff's patients who were admitted to the Critical Care Unit. Defendant Montana stated that an Executive Committee meeting would soon be called in which the events at the meeting would be discussed. He also stated that the requirement of a co-admitting physician would continue until such time as an outside reviewer could review Plaintiff's performance (*id.* at Exh. 1–L).

Custis thereafter prepared a printed copy of the minutes of the meeting (Custis Depo. at 51). All the participants signed off on the minutes except for Plaintiff (*id.* at 57). On Friday morning (the morning after the April 9 meeting), Plaintiff came to Custis' office and informed her that he would not sign them (*id.* at 58). By not signing the minutes, the Plaintiff indicated that he would not abide by a co-admission requirement (*id.*). Accordingly, a second meeting was scheduled to resolve the issue of Plaintiff's medical privileges (*id.*).

This next meeting was held on April 13. It was concluded at this meeting that, due to the two aforementioned incidents, the Plaintiff's clinical privileges needed to be suspended because he presented a risk to patient safety. Accordingly, he was summarily suspended pursuant to Article XIII, Section 6 of the Hospital Bylaws (*see* Bylaws (Doc. # 77, Exh. 2–D)). He received notice of this action the following day (*id.* at Exh. 1–A; Plaintiff's Depo. at 504).

The notice disclosed that Plaintiff's clinical privileges were immediately suspended (Doc. # 77 at Exh. 1–A). It also disclosed that, pursuant to the Bylaws, a follow-up meeting would be held on April 20, in which the Executive Committee could review this decision. Plaintiff was informed that he could make a statement at this meeting, and that he should advise the

Committee if he planned to attend (*id.*). Plaintiff received a subsequent letter on April 16, reiterating that the meeting would be held and that Plaintiff could make a statement (Plaintiff's Depo. at 506; Plaintiff's Depo.Exh. X). Plaintiff elected not to attend the meeting of April 20, because the Executive Committee would not permit him to be represented by an attorney at that meeting (Plaintiff's Aff. at ¶¶ 72–73). The meeting occurred without him.

A letter was sent to the Plaintiff shortly thereafter by certified mail which revealed to him the results of the April 20 meeting (Plaintiff's Depo. at 509–510; Plaintiff's Depo.Exh. Y). It stated that the Executive Committee recommended the continuation of the summary suspension, and that Plaintiff was ordered to attend continuing medical education classes and undergo personal counseling (*id.*). It further recited that the continuance of the summary suspension, and the recommendations of the Executive Committee, were based upon six factors: 1) concerns about patient management in Medical Record No. 154973;[3] 2) concerns about patient management in Medical Record No. 154306;[4] 3) questionable patient management in nine other listed cases; 4) continued problems in patient management over the preceding two and one-half years, as manifested in the receipt of six quality warnings from Peer Review Systems; 5) apparent decline in patient management, as evidenced by continued monitoring and review of Plaintiff's cases; and 6) concerns expressed by the Ohio State Medical Board (*id.*).

The letter recited that the basis for the summary suspension itself was the Plaintiff's "failure to appropriately respond" to the Executive Committee's concerns about the February, 1992, and April, 1992, incidents (*id.*). It states that the Plaintiff's conduct in those cases, and their proximity

3. This refers to the February, 1992 incident involving Martz.

4. This refers to the April, 1992 incident involving Sale.

in time, warranted the suspension to protect the "life and well-being of the patients," because "there appears to be a danger of immediate and serious harm to the life, health and safety of patients and prospective patients" (*id.*).

Plaintiff was advised that he had a right to ask for a hearing on the action that was taken, and on the recommendations that were proposed by the Executive Committee, within 30 days from his receipt of the notice (*id.*). Plaintiff was told that he had the right to have an attorney present at this hearing; that he could present the testimony of witnesses, and cross-examine those called against him; that he might be called as an adverse witness by the Executive Committee; that he could make a statement at the hearing; and that he could request that a record be made of the proceedings (*id.*). The letter concluded by stating that an investigation of the Plaintiff would also be conducted by "independent outside consultants" (*id.*).

Plaintiff, by letter dated April 29, 1992, responded to the notice from the Executive Committee (Doc. # 77, Exh. N; Plaintiff's Depo.Exh. Z). Plaintiff requested a hearing on the matter, and asked that it occur no later than May 8, 1992. He also requested that certain internal documents be sent to him, and that the Executive Committee provide him with a witness list for the hearing (*id.*).

The Executive Committee responded on May 15, 1992, with a document titled "Notice of Hearing on Summary Suspension" (Doc. # 77, Exh. O). Plaintiff received this document sometime after May 15 (Plaintiff's Depo. at 510–511). The Notice stated that a hearing was scheduled for June 3, 1992, in Sidney; that the proceedings would be transcribed by a court reporter; and that Gary O. Sommer, Esq., an attorney from Toledo, would act as the Hearing Officer. The Executive Committee also provided a list of eleven individuals who might be called as witnesses. The Notice

then recited that the Executive Committee requested that Plaintiff provide a written list of the witnesses he intended to call at the hearing (*id.*). It then stated that the scope of the hearing would be "limited to the bases for [Plaintiff's] Summary Suspension" (*id.*).

The June 3, 1992, meeting did not come to pass. Just before the meeting, the Defendants agreed to restore the Plaintiff's privileges (Plaintiff's Aff. at ¶ 74). Due in part to this agreement, the hearing was continued, and the Executive Committee waived any objection to timeliness under the Hospital bylaws. Further, because of a series of continuances prompted by Plaintiff's Counsel, the hearing was not held until July 20 and 21, 1994.

The purpose of the 1994 hearing was the same as when it was initially scheduled in June, 1992, *i.e.*, to determine whether the summary suspension of Plaintiff's clinical privileges on April 13 was reasonable and warranted. The Hearing Officer, Sommer, declared that the hearing should be *de novo* in nature (Hearing Officer's Report at 3 (Doc. # 77, Exh. 2–A)). He analogized the Executive Committee's decision to summarily suspend the Plaintiff's privileges to a TRO, and characterized the hearing over which he was presiding as resembling a hearing on a preliminary injunction (Transcript of Pre–Hearing Conference at 3 (Doc. # 77, Exh. 3–A)).

As stated, the hearing took place over two days in July, 1994. The Executive Committee bore the burden of proving, by the preponderance of the evidence, that its decision to suspend Plaintiff's clinical privileges summarily was warranted, based on the information then available to it. The Executive Committee presented the live testimony of four witnesses, affidavit testimony from two other witnesses, and submitted several documents as exhibits (Hearing Officer's Report at 4). Plaintiff presented affidavit testimony from three doctors, but did not testify himself (*id.*).[5]

5. Plaintiff attempted to offer two additional affidavits, but these were refused by the Hear-

Sworn testimony was presented regarding the February and April, 1992, incidents. With respect to the February, 1992, incident involving patient Martz, the Hearing Officer found as a fact that Plaintiff failed to arrive in a timely manner at the hospital to treat Martz (because he took a nap) and that "the telephonic treatment between the hours of 6:15 and 11:00 p.m. was inappropriate and inconsistent with the patient's symptoms" (Hearing Officer's Report at 10). The facts surrounding the incident involving Martz had been presented to the Executive Committee by Defendant Urbanc, at the Committee's regular morning meeting, on April 9, 1992. With respect to patient Sale, the Hearing Officer heard testimony from staff doctors at Wilson Memorial and read the affidavits of other doctors that were submitted by the Plaintiff. He concluded that the patient's health signs were communicated to the Plaintiff by Henschen at 6:50 a.m. on April 9, and that Plaintiff gave Henschen an order to cut off the oxygen going to Sale. He found that the Plaintiff's requested course of treatment was "inappropriate and life-threatening" (id.).

Testimony was also provided concerning what transpired at the April 13, meeting of the Executive Committee. Three doctors who were present at that meeting testified that the Committee discussed the incidents involving patients Martz and Sale, as well as the quality issues raised by Peer Review Systems over the preceding few years (id.). Moreover, it was also testified that the doctors discussed the results of the ongoing monitoring of the Plaintiff's performance. Specifically, they discussed the findings of the independent reviewers, who had observed "medical judgment concerns

and medical documentation difficulties" on Plaintiff's part (id.).

Based upon the testimony and other evidence received at the hearing, the Hearing Officer concluded that "there was sufficient evidence for the Medical Executive Committee to believe that an immediate action was necessary to protect the life, health and safety [of] patients and prospective patients at Wilson Memorial Hospital." (id. at 16). Accordingly, he concluded that the Executive Committee had met its burden of proving that the summary suspension of Plaintiff's clinical privileges was warranted (id.).

Recapsulating the central issue in this case, the summary suspension of the Plaintiff's clinical privileges, it bears focusing upon the true nature of the suspension of same. In sum, the Plaintiff's clinical privileges were suspended by the Executive Committee from April 13, 1992, until June 11, 1992.

In contrast to the Defendants' recitation of the reasons influencing its decisions, particularly the aforementioned facts and events of February and April, 1992, concerning the treatment of patients Martz and Sale, Plaintiff offers evidence indicating that the Defendants had an ulterior motive in taking the actions that they did. Sometime before 1992, Wilson Memorial built a new medical office building adjacent to the hospital and invited certain physicians to relocate to this building (id. at ¶ 16). It wanted the physicians to move to the building so that the tests that they normally performed in their offices could be performed at Wilson Memorial, thereby increasing the Hospital's revenue (Reyes Affidavit at ¶ 12 (Doc. # 87, Exh. G)). The concentration of physicians in this building

ing Officer. *First,* he proffered testimony from Dr. Mitchell Raskin. The Executive Committee objected, however, because the affidavit was not notarized. The Hearing Officer sustained the objection, but allowed Plaintiff's Counsel to submit a properly notarized affidavit. Plaintiff subsequently submitted a properly notarized affidavit from this witness, but the testimony was different in substance

from that of the first affidavit. For this reason, the Hearing Officer refused to accept it or make it part of the record. *Second,* Plaintiff's Counsel asked to submit testimony of the Plaintiff by way of affidavit. The Hearing Officer refused to allow this, and the Plaintiff declined to give live testimony at the hearing. *See* Hearing Officer's Report at 4–5.

would also have allowed more surgical procedures to be performed at Wilson Memorial by keeping referrals internal (*id.* at ¶ 13). Moreover, Wilson Memorial had begun to hire primary care physicians as employees, thus increasing its revenue (*id.* at ¶ 14). The Plaintiff already owned a building close to the Hospital and did not wish to become an employee of Wilson Memorial; as a consequence, he was not invited to move to the new building. (*id.* at ¶ 16).

Plaintiff suffered the resentment of his fellow doctors because of the effect his method of practice had on the income of the Defendants. Plaintiff occasionally referred patients to hospitals other than Wilson Memorial and to doctors other than those named as Defendants herein (Reyes Affidavit at ¶ 22). Plaintiff's practice of referring patients to other hospitals and to other doctors caused the Defendants to suffer a loss of income (*id.* at ¶ 23). Plaintiff performed minor surgeries and diagnostic tests in his own office, rather than referring his patients to surgeons at Wilson Memorial or having their tests performed there (*id.* at ¶¶ 25–26). These practices earned him the enmity of his fellow doctors at Wilson Memorial; Defendant Montana warned him on several occasions to stop these practices (*id.* at ¶¶ 24–26). Plaintiff believes that the Defendants' professional review actions were taken because of his refusal to move to the new building, his practice of making referrals out of the Sidney area, and the fact that he had a successful practice. As a result of the suspension, Plaintiff has lost many patients and contracts (Reyes Affidavit at ¶ 80).

Since April, 1992, Plaintiff has secured the testimony of several physicians who have reviewed the case file of patient Sale. Upon their review of the file, these doctors have concluded, in their expert opinion, that the Plaintiff's treatment of patient Sale was proper. *E.g.*, Affidavit of Richard R. Sieving, M.D., at ¶ 17 ("It is my opinion, based on [a] reasonable degree of medical certainty, that Dr. Reyes' care of patient Sale was proper.") (Doc. # 87, Exh. B); Affidavit of Mitchell C. Rashkin, M.D., at ¶ ("In my opinion, based on a reasonable degree of medical certainty, Dr. Reyes' care of patient Sale, as indicated in the medical record, was proper.") (Doc. # 87, Exh. D). Plaintiff did not produce such testimony for the Executive Committee's review at the time of the April actions.

## III. Health Care Quality Improvement Act (HCQIA)

The legal issue presented by the Defendants' Motion for Summary Judgment is whether there exist any genuine issues of material fact, such as to prevent the entry of a summary judgment in favor of the Defendants on the grounds that all of their challenged actions are protected by an immunity created by the HCQIA. The Defendants have based their Motion solely on this claim. They do not, in this Motion, challenge the evidentiary or legal sufficiency of the Plaintiff's legal claims, as they are listed in the Complaint. In other words, they do not seek a summary judgment on the basis that no genuine issues of material fact exist as to the merits of the Plaintiff's claims, irrespective of the applicability of the HCQIA.

### A. General Overview

The HCQIA was enacted by Congress in 1986 in response to what was perceived to be a crisis in the making. Specifically, Congress found that the quality of medical care was declining in the country, partly due to inadequate performance by incompetent physicians. 42 U.S.C. §§ 11101(1) and (2). Congress further found that effective professional peer review can help to remedy this problem. 42 U.S.C. § 11101(3). It found, however, that many physicians were reluctant to participate in meaningful peer review because the actions of peer review boards were often answered by the filing of antitrust lawsuits by the physicians whose actions were re-

viewed. 42 U.S.C. § 11101(4). To remedy this problem, Congress found it necessary "to provide incentive and protection for physicians engaging in effective professional peer review." 42 U.S.C. § 11101(5).

The "incentive and protection" is provided in the form of an immunity from liability in damages for most federal and state laws,[6] for conduct relating to a "professional review action" of a "professional review body." 42 U.S.C. § 11111(a)(1). The statute provides that a professional review body, any person acting as a member or staff to such a body, any person acting under contract or formal agreement with the body, or any person who participates with or assists the body, shall not be held liable in damages with respect to a professional review action. *Id.*

▮ The statute does not provide an immunity from suit. *Manion v. Evans*, 986 F.2d 1036, 1042 (6th Cir.), *cert. denied*, 510 U.S. 818, 114 S.Ct. 71, 126 L.Ed.2d 40 (1993). As the language of the statute indicates, it only provides for an immunity from damages. It states that qualified individuals and entities "shall not be liable in damages." 42 U.S.C. § 11111(a)(1). In *Manion*, the Sixth Circuit was confronted with an appeal from defendants whose motion for summary judgment, on the basis of HCQIA immunity, was denied by the District Court, which found triable issues of fact. In the course of its opinion dismissing the appeal for lack of appellate jurisdiction, the court closely examined the legislative history of the statute in an attempt to discern exactly what form of immunity it provided. The court noted that the original bill contained a much broader "protection from suit," which was rejected

"[i]n response to concerns that such protection might be abused and serve as a shield for anti-competitive economic actions under the guise of quality controls." *Id.* at 1040 (quoting the House Report). After reviewing the language of the statute and the relevant legislative history, the court concluded that the statute "does not confer a right not to stand trial." *Id.* at 1042. *Accord Bryan v. James E. Holmes Regional Medical Ctr.*, 33 F.3d 1318, 1322 n. 3 (11th Cir.1994), *cert. denied*, 514 U.S. 1019, 115 S.Ct. 1363, 131 L.Ed.2d 220 (1995).[7]

▮ To qualify for immunity under the HCQIA, the professional review action in question must satisfy four statutory requirements. *First*, it must be taken "in the reasonable belief that the action was in the furtherance of quality health care." 42 U.S.C. § 11112(a)(1). *Second*, it must be taken after "a reasonable effort to obtain the facts of the matter." 42 U.S.C. § 11112(a)(2). *Third*, it must be taken "after adequate notice and hearing procedures are afforded to the physician involved or after such procedures as are fair to the physician under the circumstances." 42 U.S.C. § 11112(a)(3). *Fourth*, the action must be taken "in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting" the preceding requirement. 42 U.S.C. § 11112(a)(4). The statute provides that an action is presumed to meet these requirements. 42 U.S.C. § 11112(a). This presumption may be rebutted, but only upon proof by the preponderance of the evidence that these standards were not met. *Id.*

---

**6.** When applicable, the statute precludes the recovery of damages for the violation of any and all state and federal laws, save and excepting two federal civil rights laws, the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, and the Civil Rights Acts, 42 U.S.C. § 1981, *et seq. See* 42 U.S.C. § 11111(a)(1).

**7.** Accordingly, a case may go to trial even though a court may have already held that the defendant was entitled to immunity from

damages under the HCQIA. In such a situation, however, a plaintiff would be limited to obtaining injunctive relief at trial. If a plaintiff did not ask for injunctive relief—or if the request for injunctive relief was no longer the subject of an active controversy—then the plaintiff's entire case would be mooted. Of course, the same is true of a given claim within a case to which the immunity under the HCQIA has been held to apply.

## B. *Resolution of Issue of HCQIA Immunity on a Pre–Trial Motion*

■ As is demonstrated by the parts of the statute which are set forth above, the statute speaks in terms of "reasonable" or "adequate," which can be questions of fact. That these are questions of fact in the case of the HCQIA is clear from the language of the statute itself, which, as stated above, provides that a defendant's review actions are presumed to meet each of the four requirements. This presumption, the statute relates, may be rebutted upon submission of proof "by a preponderance of the evidence." 42 U.S.C. § 11112(a). Because questions of law do not turn upon the satisfaction of evidentiary burdens, it is clear that the reasonableness or adequacy of a particular review action is a question of fact, to be resolved by the trier of fact.

Nevertheless, the Defendants point the Court to the decisions of the many courts which have held that a defendant's entitlement to immunity under HCQIA may properly be resolved on a motion for summary judgment. *E.g., Wayne v. Genesis Medical Ctr.*, 140 F.3d 1145, 1148–49 (8th Cir.1998); *Mathews v. Lancaster General Hosp.*, 87 F.3d 624, 628 (3d Cir.1996); *Bryan*, 33 F.3d at 1332–1334; *Austin v. McNamara*, 979 F.2d 728, 733–34 (9th Cir. 1992). These courts, beginning with the Ninth Circuit in *Austin*, have cited to the legislative history of this statute for the proposition that the issue of immunity may be properly resolved on a pretrial motion. In *Austin*, the court quoted portions of the House Report on the legislation, wherein it is noted that "[t]he Committee intends that these provisions allow defendants to file motions to resolve the issue of immunity in as expeditious a manner as possible." 979 F.2d at 734 n. 5 (citing the House Report).

In permitting the issue of HCQIA immunity to be resolved on summary judgment, these courts have not always been careful in their explanation of the analysis involved. The courts are unanimous in holding that the ultimate question of whether a defendant is entitled to this immunity is a question of law. *E.g., Bryan*, 33 F.3d at 1331–32. In other words, a jury should never be presented with the question of whether a defendant is entitled to immunity. However, before a court may arrive at this ultimate question, there are a number of subsidiary issues which require the application of law to fact. Specifically, the question of whether the review process met each of the four requirements of section 11112(a) involves questions of reasonableness and adequacy. As stated by the Eleventh Circuit, questions "such as whether the disciplined physician was given adequate notice of the charges and the appropriate opportunity to be heard" may be submitted to the jury on special interrogatories. *Bryan*, 33 F.3d at 1333.

In granting motions for summary judgment, the courts in each of the aforementioned decisions have determined that the plaintiff failed to demonstrate the existence of genuine issues of material fact on each of the four elements contained within section 11112(a). In other words, these courts concluded, as a matter of law, that the defendants in question had acted "reasonably" and that the procedures in question contained "adequate" protections for the physicians in question.

These courts have been able to declare that the defendants' actions were reasonable, as a matter of law, because of the statutory presumption. Reviewing the decisions, it is apparent that the courts have required the production of evidence by the plaintiff that would create a triable issue on one of the four elements in section 11112(a). Absent the production of such evidence, there is no need for a trial because of the presumption that the defendants *are* entitled to the immunity afforded by the statute. *E.g., Wayne*, 140 F.3d at 1149 (plaintiff's evidence "insufficient to rebut the presumption established in section 11112(a)"). Again, the statute presumes that qualified defendants have acted in accordance with the four standards set

forth in section 11112(a). It is a plaintiff's burden to adduce evidence sufficient to create a genuine issue of material fact regarding that presumption. If a plaintiff does not have any such evidence, there is no genuine issue of material fact and, consequently, there is no need for a trial.

The Plaintiff urges the Court to reject the foregoing approach. He argues that the issue of HCQIA immunity does not easily lend itself to resolution at the summary judgment stage. Plaintiff argues that his burden is relatively slight. "Once the plaintiff has alleged that the defendants have failed to satisfy the requirements of HCQIA immunity," he argues, "the Court must rely on the Federal Rules of Civil Procedure, particularly the obligations of parties and attorneys under Rule 11, to stem the tide of lawsuits subsequently found to be without factual or legal foundation." Plaintiff's Memorandum in Opposition at 17 (Doc. # 87).

In support of the foregoing argument, the Plaintiff relies upon the decision of the Third Circuit in *Brader v. Allegheny General Hospital,* 64 F.3d 869 (3d Cir.1995). The Court finds the Plaintiff's reliance on this case to be misplaced for two reasons. *First,* the court in that case did not hold that the issue of HCQIA immunity could not be resolved on a motion for summary judgment. Rather, the court held that, at the pleadings stage, the plaintiff's complaint alleged sufficient facts for a court to conclude that the defendants were not entitled to immunity under HCQIA. The court's opinion cannot be read to suggest that a plaintiff may survive a summary judgment motion by resting on the arguments contained in his legal memoranda. *Second,* the Court notes that the Third Circuit has, in fact, affirmed the grant of immunity under HCQIA at the summary judgment stage. *See Mathews,* 87 F.3d at 628. Accordingly, the Court finds unpersuasive the Plaintiff's argument that the *Brader* case stands for the proposition that HCQIA immunity may not be resolved on a motion for summary judgment.

For the reasons sets forth in the preceding paragraphs, the Court agrees that the issue of HCQIA immunity may be resolved on a motion for summary judgment. In fact, based upon the presumption contained within section 11112(a), a defendant's motion for summary judgment will be granted—assuming the defendant is otherwise entitled to HCQIA immunity—unless the plaintiff is able to demonstrate that he has evidence sufficient to create a genuine issue of material fact regarding the presumption. In so proceeding, the Court notes that it is in the company of every other court to have considered the issue in a published opinion. The Court also notes that this is the same position adopted by another Judge in this District, on the same question of law. *See Rooney v. Medical Center Hospital of Chillicothe,* No. C–2–91–1100, 1994 WL 854372 (S.D.Ohio Mar. 30, 1994) (Beckwith, J.) (granting HCQIA immunity at the summary judgment stage).

### C. Use of Evidence of "Bad Faith" on Part of Reviewers

█ As the previous section makes clear, a plaintiff bears the crucial burden of producing evidence which could negate the statutory presumption that an eligible entity has acted in accordance with section 11112(a). The courts which have addressed the issue of immunity under the HCQIA have been unanimous in holding that a plaintiff cannot prove the "unreasonableness" of a defendant's actions by introducing evidence suggesting that a defendant acted in "bad faith." Rather, the courts have held that such evidence is irrelevant. A defendant's actions must be judged on an objective basis. Accordingly, what is relevant, and dispositive, is whether there existed an objectively reasonable basis for the defendant's actions. *E.g., Wayne,* 140 F.3d at 1148; *Brown v. Presbyterian Healthcare Services,* 101 F.3d 1324, 1333 (10th Cir.1996); *Bryan,* 33 F.3d at 1335–36; *Austin,* 979 F.2d at 734 ("The

test is an objective one, so bad faith is immaterial.").

The common holding of these courts—that an objective, and not subjective, standard must be used—is based primarily upon the legislative history of the statute. The bill was evaluated by the House Committee on Energy and Commerce. The House Report on section 11112(a) states that the Committee had considered, but ultimately rejected, a "good faith" standard for review actions. *See* H.R.Rep. No. 99–660, at 10 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6287, at 6392. The Report states that, in response to concerns that "good faith" would be read as "requiring only a test of the subjective state of mind of the physicians conducting the professional review action," the Committee switched to the more objective "reasonable belief" standard. *Id.* at 6392–93. Within the universe of published decisions addressing this issue, the courts are unanimous in holding that evidence of "bad faith" does not suffice to overcome the presumption that a defendant acted "reasonably."

The Plaintiff, however, has cited to two decisions that he believes mandate a contrary conclusion on the issue of whether a subjective standard applies. *First,* he cites to the Supreme Court's decision in *Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991). In particular, he points to a footnote in Justice Stevens' opinion, in which reference is made to remarks from a House sponsor of the legislation, contained within the legislative history. The remarks are those of Representative Waxman, who stated that "illegitimate actions taken under the guise of furthering the quality of health care" are not protected by the HCQIA. *Id.* at 332 n. 8, 111 S.Ct. 1842 (citing legislative history). Further, Waxman stated that "[a]ctions ... that are really taken for anticompetitive purposes will not be protected under this bill." *Id.*

For several reasons, the Court does not find the citation to the *Summit Health* case to be relevant. *First,* as an initial matter, the question the Court resolved in that case had nothing to do with the HCQIA. *See Summit Health,* 500 U.S. at 324, 111 S.Ct. 1842 ("[t]he question presented is whether the interstate commerce requirement of antitrust jurisdiction is satisfied by [certain] allegations...."). Accordingly, any discussion of the HCQIA is dictum. *Second,* in any event, Justice Stevens in no way endorsed the statement by Representative Waxman; he merely noted it in a footnote. *Third,* Waxman's statement—to the extent it may even be read to imply the use of a subjective test—is in direct conflict with the text of the House Report. The Report, of course, is meant to distill the thoughts of the members of the entire House (or at least those of the Committee), whereas the cited remarks of Representative Waxman represent the views of only one member of the House, even if that one member was a sponsor and floor manager of the legislation in question. Accordingly, the Court is not persuaded by the citation to *Summit Health.*

*Second,* the Plaintiff cites the Court to the decision of a New Jersey Magistrate Judge in the case of *Wei v. Bodner,* 127 F.R.D. 91 (D.N.J.1989). The Plaintiff's citation to this case is entirely unconvincing. The issue addressed in *Wei* was whether to grant a motion to compel discovery of certain documents. The immunity provisions of the HCQIA were not discussed in the entirety of the Magistrate Judge's opinion in that case. Rather, the statute was discussed only in regard to the question of whether it prevented the release of certain information. Because the issue of immediate importance—whether an objective or subjective standard must be used to judge a defendant's reasonableness under the HCQIA—was not discussed within the *Wei* decision, the Court concludes that *Wei* is not relevant to the resolution of this issue.

The Court finds itself in agreement with the position taken by every other court to

have considered this issue. The standard of "reasonableness" that must be met is an objective one. Evidence of subjective bad faith on the part of a defendant is, therefore, not relevant.

### D. *Use of Expert Testimony as to Quality of Doctor's Performance*

In addition to evidence impugning the motives of the reviewers, plaintiffs have often relied upon the testimony of medical experts in their attempt to rebut the statutory presumption of immunity provided in section 11112(a). In a typical factual scenario, a physician's privileges are restricted or suspended due to the perception that the care rendered by the physician is sub-par. The perception is prompted by the recounting of the physician's activities by colleagues or other medical professionals. The physician then sues those associated with the review process, and attempts to overcome the presumption that they acted "reasonably" by submitting affidavit testimony from medical experts. These experts, after reviewing case histories, then testify that the physician acted properly in pursuing a particular course of action.

Based upon such expert testimony, the physicians have argued that a summary judgment may not properly be entered in favor of the members of the review board, because there is a genuine issue of material fact concerning the propriety of the care given by the physician. With the possible exception of one case (which is discussed below), the courts have held that such expert testimony does not create a genuine issue of material fact and, therefore, does not prevent the entry of a summary judgment for defendants. *E.g., Mathews,* 87 F.3d at 635; *Imperial v. Suburban Hospital Ass'n,* 37 F.3d 1026, 1030 (4th Cir. 1994); *Bryan,* 33 F.3d at 1330–31.

In reaching this conclusion, the courts have reasoned as follows. The statute provides an immunity for actions taken "in the *reasonable belief* that the action was in the furtherance of quality health care." 42

U.S.C. § 11112(a)(1) (emphasis added). As stated above, the statute provides that it is presumed that an action *is* taken in the "reasonable belief" that it was in the furtherance of quality health care. 42 U.S.C. § 11112(a). Accordingly, to defeat a motion for summary judgment, a plaintiff must point to evidence, of an objective nature, that could be used to defeat the presumption that the review board was acting in the reasonable belief that it was furthering the goal of quality health care.

Because the test looks to whether a defendant had a "reasonable belief," expert medical testimony as to the actual correctness of the physician's care will typically be insufficient. As stated by the Fourth Circuit, "even if [a plaintiff] could show that these [reviewing] doctors reached an incorrect conclusion on a particular medical issue because of a lack of understanding," such evidence is simply insufficient to meet the plaintiff's burden. *Imperial,* 37 F.3d at 1030. This is because a plaintiff must contradict "the existence of a reasonable belief that [the reviewers] were furthering health care quality in participating in the peer review process." *Id.*

Demonstrating the existence of a triable issue of fact over whether a plaintiff actually performed deficiently is irrelevant. A plaintiff must, rather, demonstrate that there exists a triable issue as to whether the result reached by the peer review board was based on a "reasonable belief" that it "was in the furtherance of quality health care." *See Mathews,* 87 F.3d at 636 n. 9 ("While the conflicting reports raise an issue of fact as to whether Mathews provided acceptable care, they do not call into question whether the Board's decision in relying on the Wilson report was reasonable."); *Gureasko v. Bethesda Hospital,* 116 Ohio App.3d 724, 731, 689 N.E.2d 76, 81 (Ohio Ct.App.1996) ("The reasons for a summary suspension can ultimately be wrong; that is not the test of whether there has been a [section 11112(a) ] violation") (citing *Austin* ). Unless the genuine issue of fact concerns the reasonableness

of the defendant's belief, then the issue is not material to the litigation.

In support of an opposing conclusion, the Plaintiff relies on *Brown v. Presbyterian Healthcare Services*, 101 F.3d 1324 (10th Cir.1996). That case, unlike most of the others discussed above,[8] was tried to a jury, and a verdict was rendered in favor of the plaintiff on the merits of her claims. The case came before the Tenth Circuit on an appeal from the District Court's denial of a post-verdict, Rule 50 motion made by the defendants. Of course, the legal standard applied to a motion under Rule 50 is, practically speaking, the same standard that should be applied under Rule 56: Is there legally sufficient evidence to support a judgment in favor of the non-moving party? Accordingly, because the same standard applies to a court's disposition of a Rule 50 motion as applies to a motion under Rule 56, the analysis used by the Tenth Circuit in *Brown* is completely applicable here.

The facts in *Brown* are as follows. After concerns about the quality of her care were raised, Brown, an obstetrician in New Mexico, agreed to a requirement that she consult with an obstetrics specialist when treating high-risk patients. A fellow doctor later filed formal peer review proceedings against Brown, alleging that she failed to abide by that requirement. The Executive Committee heard testimony from Brown and the other doctor and reviewed the charts of two patients. The Executive Committee concluded that Brown had indeed failed to abide by the consultation requirement and, as a sanction, it recommended that Brown's privileges be removed. The recommendation was adopted.

Brown subsequently sued the hospital and two other doctors, who had participated in the peer review process. The defendants raised the HCQIA as an issue in the case, and made it one basis for their post-verdict Rule 50 motion. The Tenth Circuit held, based on the evidence at trial, that a reasonable jury could have found that the peer review action was not taken after a reasonable effort to obtain the facts involved. The court relied upon the expert testimony of a witness who reviewed the charts of all the patients that Brown had treated for six months prior to her dismissal. This witness concluded that Brown had properly identified high-risk patients and had properly obtained expert consultation when necessary. More importantly, however, he also testified that the peer review board's reliance on "only two charts [in reaching its conclusion] was unreasonably narrow and did not provide a reasonable basis for concluding Dr. Brown posed a threat to patient safety." 101 F.3d at 1334. In a footnote, the court stated that it found the witness' testimony to be sufficient to raise a fact issue regarding the statutory presumption that the Defendants acted reasonably. *Id.* at 1334 n. 9.

Upon review of the *Brown* decision, the Court concludes that it is entirely consistent with the other cases which have addressed the issue of whether expert testimony may be used to create a genuine issue of material fact as to whether the presumption that the four standards in section 11112(a) are satisfied. The expert testimony implicated in *Brown* is categorically different from that which was at issue in all of the other cases. In *Brown*, the

8. Another case that was resolved post-trial is the *Bryan* case from the Eleventh Circuit. That case, like the *Brown* case, was tried to a jury which returned a verdict for the plaintiff on the merits of his antitrust claims. And, like *Brown*, the *Bryan* case came before the Eleventh Circuit on an appeal from the District Court's denial of the defendants' motion for judgment under Rule 50. The principal difference in the cases, however, is that the Eleventh Circuit reversed the District Court and held that the plaintiff had failed to produce evidence sufficient to create a triable issue of fact on the elements of HCQIA immunity. Accordingly, the Eleventh Circuit reversed the District Court's denial of the defendants' Rule 50 motion, thereby vacating the jury award and rendering judgment in favor of the defendants. *See Bryan*, 33 F.3d at 1337.

expert called into question the *reasonableness* of the review board's actions by attacking the procedure it had used, and not by simply attacking the correctness of the medical conclusion it had reached. By focusing on the procedure, and testifying that it was an unreasonable way in which to proceed, the witness' testimony created a genuine issue as to whether the review board had acted reasonably—a material question—and not simply whether they reached the right medical result—a non-material question.

Based upon the foregoing discussion, the Court concludes that there is no dispute among the courts to have considered this issue. In sum, a fact issue as to whether the peer review board reached the right conclusion about a physician's medical care is not material. It is not material because its resolution does not bear upon any of the four elements of reasonableness that are contained within section 11112(a). Rather, in order to create a genuine issue of material fact on the issue of HCQIA immunity, the plaintiff's evidence must relate to one of these four elements. Absent the production of such evidence, a summary judgment is properly entered in favor of a defendant who is otherwise eligible for its protections.

## IV. *Analysis of the Defendants' Motion for Summary Judgment (Doc. # 77)*

The Court now turns to an analysis of the merits of the Defendants' Motion. The Defendants have the initial burden of demonstrating the absence of a genuine issue of material fact as to their general eligibility for the protections of the HCQIA. They may meet their burden by use of those materials that are specifically allowed by Rule 56. With respect to the "due process" or "reasonableness" analysis contained within section 11112(a), the Defendants enjoy a unique advantage. As stated in the preceding pages, the Defendants enjoy a statutory presumption that their actions were in accord with section 11112(a). The Defendants do not carry an initial burden of production on this issue, beyond, perhaps, showing how they generally acted reasonably. The real burden lies with the Plaintiff, who must point to proper evidentiary materials which are legally sufficient to create a genuine issue of material fact as to any one of the four elements contained within section 11112(a).

### A. *Defendants' Eligibility for Protection of the HCQIA*

 The first question is whether these Defendants are among the entities that are eligible for protection under the HCQIA. The statute provides that protection may be afforded to a "professional review body," to "any person acting as a member or staff to the body," to "any person under contract or other formal agreement with the body," and to "any person who participates with or assists the body with respect to the action." 42 U.S.C. § 11111(a). The term "professional review body" is defined to mean "a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity." 42 U.S.C. § 11151(11).

The Court concludes that each of the Defendants is eligible for the immunity provided by the HCQIA. As will be set forth in the following sections, the Court holds that these Defendants were engaged in peer review activity. Moreover, the Defendants' evidence supports a finding that they meet the statutory categories set forth in the preceding paragraph. *See* Evans Aff. at ¶ 7 ("Each of the physician defendants . . . served as members of the Executive Committee that acted as a Professional Review Body when it summarily suspended Dr. Reyes' clinical privileges.") (Doc. # 77, Exh. 1). In any event, Plaintiff does not contest that the Defendants are otherwise *eligible* for the immunity from damages that is provided by the statute.

### B. Activity(ies) Subject to HCQIA Analysis

■ There is an initial dispute among the parties as to which of the various actions by the Defendants must be subjected to the four-part reasonableness analysis contained within the HCQIA, at section 11112(a). The Defendants contend that the only action that must be subjected to this reasonableness test is the action taken on April 13, 1992. *See* Defendants' Reply at 15. Plaintiff, on the other hand, believes that there are five such actions, each of which must be subjected to the reasonableness review of section 11112(a). *See* Plaintiff's Memorandum in Opposition at 22. For the reasons that follow, the Court concludes that there are, in fact, three actions that must be reviewed for their reasonableness, as defined in section 11112(a).

Before examining the definition of "professional review action," the Court must first look to the definition of "professional review activity." This term is defined as meaning "any activity of a health care entity with respect to an individual physician," to do one of three things: 1) "to determine whether the physician may have clinical privileges with respect to, or membership in, the entity," 42 U.S.C. § 11151(9)(A); 2) "to determine the scope of conditions of such privileges or membership," 42 U.S.C. § 11151(9)(B); or 3) "to change or modify such privileges or membership." 42 U.S.C. § 11151(9)(C). With this definition in mind, the Court turns to the next step.

The HCQIA provides protection for "professional review actions." The statute provides that this term "means an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity." 42 U.S.C. § 11151(9). Further, it must be "based on the competence or professional conduct of a physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician." *Id.* The statute also provides immunity for those "professional review activities" which relate to a "professional review action." *Id.*

The evidence of record, when it is construed most strongly in favor of the Plaintiff, indicates that there were three occasions on which "professional review actions" occurred. The first such occasion was April 9, 1992, when the Executive Committee restricted Plaintiff's staff privileges. Such an action comes within the definition of "professional review action." The second occasion consists of the summary suspension of the Plaintiff's clinical privileges on April 13, 1992. The third occasion was the Executive Committee meeting of April 20, 1992, when the Committee ratified the decision of April 13. The definition of "professional review action" includes within it "a formal decision not to take an action or recommendation ..." 42 U.S.C. § 11151(9).

Plaintiff's arguments concerning the other dates are unavailing. The statute clearly speaks in terms of actions which result in recommendations being promulgated or in the suspension or curtailment of a physician's hospital privileges. Accordingly, the Executive Committee's decision to deny the Plaintiff a hearing as quickly as he wished does not constitute a "professional review action." Moreover, the Executive Committee's decision to reinstate the Plaintiff's medical privileges cannot be grounds for complaint. Although an "action" was surely taken in regard to the Plaintiff's privileges, this "action" inured to the benefit of the Plaintiff. The statute provides that a "professional review action" must have an adverse impact upon a physician. 42 U.S.C. § 11151(9). Plaintiff's suggestion in the briefs that the restoration of Plaintiff's privileges was only partial is not supported by any evidence of record which has been brought to the attention of the Court. Because this case is before the Court for resolution under Rule

56, the Court is not entitled to rely upon bare evidentiary assertions contained within the text of a legal memorandum.

The Defendants' argument that there was only one such "professional review action" is also unpersuasive. The Defendants point out in their Reply (Doc. # 90 at 13–15) that the statute speaks in terms of "discrete decisions." However, this citation does not help the Defendants' argument that there was only one such "professional review action." It is certainly true that all of the actions of the Executive Committee related to one course of conduct by the Plaintiff. However, when the evidence is construed most strongly in favor of the Plaintiff, it appears to the Court that there were three discrete "professional review actions," as that term is defined in the statute. 42 U.S.C. § 11151. Accordingly, each must be analyzed separately.

### C. The Decision of April 9, 1992

█ In determining whether the Defendants are immune for the April 9, 1992, decision to place restrictions on Plaintiff's staff privileges, the Court must apply the test for reasonableness contained within section 11112(a).

For purposes of the instant review action, which consisted of a four-day restriction on Plaintiff's privileges, the Court need only examine three of the four standards set forth in this section. The third standard—which requires adequate notice and certain hearing procedures—is not applicable in this instance. Section 11112(c)(1)(B) provides that this third standard is not applicable "in the case of a suspension or restriction of clinical privileges, for a period of not longer than 14 days, during which an investigation is being conducted to determine the need for a professional review action." The evidence of record indicates that the initial, April 9 decision to restrict the Plaintiff's privileges lasted for a term of four days. The evidence further demonstrates that an investigation was launched during this time.

Given this undisputed evidence, the Court must conclude that the third standard does not apply to the April 9 action.

This test, therefore, contains three elements. *First*, did the Defendants "act in the reasonable belief that the action was in the furtherance of quality health care"? 42 U.S.C. § 11112(a)(1). The Defendants have directed the Court to the incident involving patient Sale as evidence that they were motivated by a concern over patient safety. They have carried their initial burden in this regard. The Plaintiff's rejoinder evidence consists of the Plaintiff's testimony that the Defendants were acting to restrain trade in violation of the Sherman Act. In other words, Plaintiff asserts that they were acting in bad faith. For the reasons stated previously, evidence relating to the Defendants' underlying motives is irrelevant.

The Plaintiff also cites the Court to the testimony of certain expert witnesses. Specifically, Plaintiff directs the Court's attention to the testimony of three doctors, John R. Laughrey, Richard R. Sieving, and Mitchell C. Rashkin. *See* Doc. # 87, Exhs. A, B, & D. Each of these doctors claims to have familiarity with the case due to his review of the case file. *See* Loughrey Aff. at ¶ 17 (based on analysis of chart and discussion "with Dr. Terrance Reuland, a Board-certified pulmonary specialist"); Sieving Aff. at ¶ 17 (based on review of Sale's medical record); Rashkin Aff. at ¶ 3 (reviewed Sale's chart). The affidavit testimony of these doctors concerns the propriety of care given to Sale by Plaintiff on the morning of April 9, 1992. Each of these doctors concludes that the Plaintiff's care was appropriate. *See* Loughrey Aff. at ¶ 5 ("Dr. Reyes' course of treatment of Mr. Sale was proper and appropriate."); Sieving Aff. at ¶ 17 ("... Dr. Reyes care of Patient Sale was proper."); Rashkin Aff. at ¶ 22 ("... Dr. Reyes' care of patient Sale, as indicated in the medical record, was proper.").

Plaintiff also directs the Court's attention to other evidence. For instance, there is the affidavit of an expert in nursing, Georgeanne Faryar. In her affidavit, Faryar testifies that the nurse who disobeyed the Plaintiff's instructions engaged in improper conduct. *See* Faryar Aff. (Doc. # 87, Exh. C). Plaintiff also cites to a letter written by an outside expert for the Executive Committee, in relation to the Sale case. In a letter written on April 27, 1992, Dr. Virginia Wood responded to the Committee's request to review the Sale chart (Doc. # 87, Exh. F). She wrote that the Plaintiff's care of Sale was not indicative of a major quality problem. The overall tone of the letter suggests that she found nothing wrong with the Plaintiff's care, except for some documentation problems (*id.*).

The Court concludes that there exists no genuine issue of material fact as to whether the Plaintiff rebutted the presumption that the Defendants, as an objective matter, proceeded in the "reasonable belief" that their action was in the furtherance of quality health care. As the Court stated in a preceding section, the actual quality of the Plaintiff's care of Sale is not a material issue in this case. The question, rather, is whether the Defendants acted with a reasonable belief in its determination. None of the expert testimony regarding the quality of the care the Plaintiff provided is relevant to this issue. Neither, for that matter, is the letter from Dr. Wood, since that letter was not written until after the Executive Committee took its action. Accordingly, the Court concludes that there is no genuine issue of material fact as to whether the Defendants acted in the "reasonable belief" that their action was in furtherance of quality health care.

*Second,* did the Defendants delay action until they could make "a reasonable effort to obtain the facts of the matter"? 42

U.S.C. § 11112(a)(2). The evidence of record indicates that no action was taken until after the Executive Committee was able to question the Plaintiff about his treatment of Sale on the morning of April 9. Further, the minutes of the meeting indicate that Defendant Urbanc summarized for the Committee his conversations with Louisa Henschen, the nurse who was on duty that morning and had attended to Sale. The minutes also reveal that Urbanc related to the Committee the facts surrounding the February, 1992, incident involving Vivian Martz. The Court concludes that the Defendants have carried their burden of bringing forth evidence demonstrating that they are entitled to the continuing presumption that they acted only after a reasonable investigation. Because the Plaintiff's only evidentiary rejoinder again consists of testimony impugning the motives of the Defendants, the Court must conclude that the Plaintiff has not carried his burden of proving that fact issues exist such as prevent the entry of a summary judgment on this question.

*Third,* did the Defendants act "in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts"? [9] Once again, the evidence produced by the Defendants is sufficient to demonstrate that they are entitled to continuing presumption that they meet this requirement. In short, there was a dispute as to whether the Plaintiff had almost caused the death of one of his patients. Although the Plaintiff denied that his actions were wrongful, there were a medical doctor and a nurse who were afraid that Plaintiff's proposed course of treatment had, indeed, almost caused the unnecessary death of patient Sale. The Executive Committee had this information, and made a decision that afternoon. The Plaintiff, once again, relies

9. The fourth step ordinarily requires adherence to the procedures set out in standard number 3. However, as noted above, standard number 3 is not applicable in case such as this. *See* 42 U.S.C. § 11112(c)(1)(B). Accordingly, the Court will not factor into its analysis of the fourth standard, the question of whether Defendants met "the requirement of paragraph (3)."

upon irrelevant evidence which attacks the Defendants' motives. With this evidence, the Plaintiff does not demonstrate the existence of a genuine issue of material fact on this third standard.

The Court concludes that there exists no genuine issue of material fact as to whether the Defendants met each of the three applicable standards set forth in 42 U.S.C. § 11112(a). That being the case, the Court must conclude that the Defendants are entitled to a summary judgment in their favor on the issue of whether they are entitled to the immunity contained within 42 U.S.C. § 11111(a)(1), for the professional review action of April 9, 1992.

### D. *The Summary Suspension of April 13, 1992*

The Court turns to the Executive Committee's decision on April 13, 1992, to summarily suspend all of the Plaintiff's privileges at the Hospital.

*First*, was the decision taken "in the reasonable belief that the action was in the furtherance of quality health care?" 42 U.S.C. § 11112(a)(1). The Plaintiff, again, asserts that the Defendants acted in bad faith. Plaintiff asserts that the real reason for the summary suspension of his medical privileges on April 13 had nothing to do with "quality health care," but was in retaliation against him for not signing the minutes of the April 9 meeting. *See* Memorandum in Opposition at 23. The Court concludes that this argument does not create a genuine issue of material fact. As an initial matter, it is unsupported by any evidence: Plaintiff's Memo fails to cite the Court to anything in the record to support such a claim. Moreover, as the Court has stated previously, evidence of subjective bad faith is not legally relevant, because the test is an objective one.

The Plaintiff also relies upon the aforementioned expert testimony. For the same reasons the Court determined that this testimony did not present a genuine issue of material fact as to the incident of April 9, the Court concludes that it fails to do so in regard to the summary suspension of April 13. In short, the evidence does not call into question the reasonableness of the Defendants' beliefs. To the contrary, it calls into question the ultimate correctness of their medical conclusions. Absent some evidence indicating that it was objectively unreasonable for the Defendants to have believed they were acting the interests of quality health care, the Court must conclude that the Plaintiff has failed to demonstrate that there exists a genuine issue of material fact on this element of section 11112(a).

*Second,* was the April 13 action taken "after a reasonable effort to obtain the facts of the matter"? 42 U.S.C. § 11112(a)(2). Plaintiff argues that this standard has not been met because the Defendants did not conduct any additional discovery between April 9 and April 13. The Court disagrees. Simply because additional evidence could have been—but was not—discovered between April 9 and April 13, does not cast doubt upon the presumption that the Executive Committee acted after a reasonable effort to obtain the facts. The evidence of record, when construed most strongly in favor of the Plaintiff, does not contain any evidence which can be used to create a genuine issue of material fact regarding the presumption that the Defendants acted in accordance with the standard contained within section 11112(a)(2). Plaintiff points to no law or expert testimony that states that a review board's failure to conduct additional discovery after it makes an initial decision constitutes unreasonable behavior.

*Third,* was the Plaintiff afforded adequate notice and opportunity to be heard, or were such other procedures provided that were fair under the circumstances? 42 U.S.C. § 11112(a)(3). As stated above, this requirement was not imposed in regard to the April 9 meeting, because suspension of privileges lasted only four days. Assuming that the standard *is* applicable to the action of April 13, the Plain-

tiff has failed to introduce any evidence suggesting that Plaintiff was not aware of the meeting, was otherwise prejudiced by the timing or scope of the meeting, or was denied an opportunity to be heard. Accordingly, because the Defendants are presumed to have acted in accordance with this requirement, and because the Plaintiff has pointed to no evidence which suggests otherwise, the Court concludes that no genuine issues of material fact exist as to this standard.

*Fourth,* was the suspension of the Plaintiff's staff privileges ordered in the reasonable belief that the action was warranted by the facts known to the Executive Committee? 42 U.S.C. § 11112(a)(4). The Plaintiff has failed to adduce any evidence which might tend to call into question the continuing presumption that the Defendants acted under such a "reasonable belief." Accordingly, the Court must conclude that there is no genuine issue of material fact as to the Defendants' satisfaction of this fourth element.

As is set forth above, the Plaintiff has failed to demonstrate that there exists a genuine issue of material fact as to the Defendants' satisfaction of the four elements contained within section 11112(a). That being so, the Court must sustain the Defendants' Motion for Summary Judgment in regard to any damages caused by the April 13, 1992, decision to suspend Plaintiff's staff privileges.

E. *Decision of April 20, 1992, to Continue the Suspension*

The meeting of April 13, 1992, was called in order to review the Plaintiff's status following the incident with patient Sale of April 9. Because the meeting of April 13 took place on short notice, the Committee was required to convene a follow-up meeting shortly thereafter. This follow-up meeting, as indicated above, occurred on April 20, 1992.

As with the review actions that occurred on April 9, 1992, and on April 13, 1992, the Plaintiff has offered no evidence that can be used to create a genuine issue of material fact as to whether the Defendants failed to act in accordance with the four standards set forth in section 11112(a), thereby calling into question the legal presumption contained therein. Because the Plaintiff has failed to carry this burden, the Court must conclude that there is no genuine issue of material fact as to whether the Defendants are entitled to the protection of the HCQIA for their activities in relation to the decision of April 20, 1992.

VI. *Effect of HCQIA Immunity Upon Plaintiff's Case*

The Defendants have asked that the Court grant their Motion for Summary Judgment and to "conclude that all Defendants are immune from damages under the HCQIA." (Doc. # 77 at 49). At another place in their legal memoranda, the Defendants have indicated that they believe their Motion is dispositive of all the claims raised by the Plaintiff in his Complaint. *See* Defendants' Reply at 15 ("this Court should grant Defendants' Motion for Summary Judgment and dismiss Plaintiff's Complaint") (reduced from capitals) (Doc. # 90). The Court, as set forth above, has concluded that the evidence of record does not give rise to a genuine issue of material fact as to whether the Defendants are entitled to the immunity set forth therein. It must yet be determined, however, what the effect of this conclusion is in regard to the myriad claims raised in the Plaintiff's Complaint (Doc. # 1).

The statute provides that, if the various requirements are met, qualified entities and persons "shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action." 42 U.S.C. § 11111(a). Moreover, the definition of "professional review action" includes within it all professional review activities "relating to" the action. 42 U.S.C. § 11151(9). Upon reviewing the allegations set forth in the Plaintiff's Complaint,

the Court concludes that the immunity conferred by the HCQIA does not warrant the dismissal of the Plaintiff's Complaint.

Count One alleges a conspiracy to wrongfully deprive the Plaintiff of his medical practice, in violation of the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 *et seq.* A review of the allegations in the Complaint makes plain that the Sherman Act claim concerns, at least in part, the professional review actions at issue here. *See, e.g.,* Complaint, ¶ 113 ("Among other acts, and without limitation, the Defendants conspired to ... revoke Plaintiff's staff privileges at the Defendant Hospital ..."). Because the Defendants' peer review activities are plainly encompassed within the grant of damages immunity under the HCQIA, the Court concludes that no genuine issue of material fact exists as to the Defendants' immunity from damages under the legal claim set forth in Count One, but only to the extent said claim relates to the Defendants' activities in relation to the professional review action.

■ If Count One related solely to the professional review actions, then the Defendants could not face any liability for damages under Count One. However, it is not clear that the alleged antitrust violation is so limited. The Plaintiff has seemingly alleged a broader cause of action, which includes a failure to invite him to the Hospital's new office tower, among other things. Such an action cannot be said to "relate to" the professional review actions that were taken against him. The Defendants have failed to demonstrate that there exist no genuine issues of material fact as to the breadth of the Plaintiff's Sherman Act claim. Accordingly, the Court concludes that the Plaintiff may still seek damages under Count One, but only to the extent that said claim addresses actions by the Defendants that do not relate to any professional review activities undertaken by the Defendants.

The Court now considers Count Two. The HCQIA recites that it provides an immunity from the recovery of damages under any federal or state law, with two exceptions. The first exception, Title VII of the 1964 Civil Rights Act, is not relevant here because it has not been raised by the Plaintiff as a basis for recovery. The second exception—the Civil Rights Acts, set forth in 42 U.S.C. § 1981 and those following—is relevant here because two of the Plaintiff's legal claims arise thereunder.

■ Specifically, Count Two alleges that the Defendants are state actors and that they violated the Fourteenth Amendment of the U.S. Constitution by depriving the Plaintiff of a property interest without due process of law. Because violations of the Fourteenth Amendment are remediable under 42 U.S.C. § 1983, the Court presumes that Count Two arises under this statute. Because the HCQIA does not provide any immunity from damages for violations of § 1983, the Court must conclude that HCQIA immunity does not attach to Count Two.

■ Counts Three and Seven relate to an alleged agreement among the parties that the Defendants would not make a report to the National Practitioner's Data Bank about the personnel action taken against the Plaintiff. Hospitals are required to make such reports under the HCQIA. *See* 42 U.S.C. § 11133. It is plain that the reporting of this information is an activity encompassed within the immunity provided by the HCQIA. *See* 42 U.S.C. § 11137(c) ("no person or entity ... shall be held liable in any civil action with respect to any report made under this subchapter ..."). Such reporting cannot be the basis for any civil liability unless the information contained within the report is knowingly false. *Id.*

Because there is no allegation (or, indeed, any evidence) that the information contained within the reports—that the Plaintiff was suspended—was knowingly false, the Court concludes that the immunity applies. Accordingly, the Court concludes that there is no genuine issue of material fact as to whether the Defendants

are entitled to HCQIA immunity against the claims raised in Counts Three and Seven of the Plaintiff's Complaint. Moreover, unlike the immunity from damages that is discussed above, the immunity involved here is complete: it is not limited to immunity from liability in damages. 42 U.S.C. § 11137 ("No person ... shall be held liable in any civil action ..."). Accordingly, the Defendants also have an immunity from the Plaintiff's claims for injunctive relief on these two Counts.

Count Four, like Count Two, also alleges a claim for recovery of damages due to a violation of the Fifth and Fourteenth Amendments to the U.S.Constitution. Because the claims under these two Amendments arise under 42 U.S.C. § 1983, the HCQIA cannot provide the Defendants with any protection from damages liability. *See* 42 U.S.C. § 11111(a). Accordingly, the Court cannot award the Defendants a summary judgment on the issue of liability for damages under either of these two legal theories.

■ Count Four also, however, alleges a claim under the Ohio Constitution. Because a claim under the Ohio Constitution cannot be deemed to arise under § 1983 (a statute which provides a remedy only for violations of federal rights), the Defendants might be eligible for immunity from damages for this claim. The Plaintiff's' claim appears to be that he was denied due process in the context of the professional review actions. The key allegations in the Complaint regarding Count Four are paragraphs 144, 145, and 146, each of which discusses the Defendants' actions solely in relation to the professional review actions. The Court must conclude, as a consequence, that there is no genuine issue of material fact as to whether the Defendants are entitled to an immunity from damages for any violation of the Ohio Constitution, as set forth in Count Four.

■ Counts Five and Eight allege claims of tortious interference with contract and business relationships. Count Five alleges that the Defendants "convinced the Plaintiff's patients and nursing homes to breach and terminate their fiduciary and/or contractual and/or business relationships with the Plaintiff." Complaint, ¶ 150. The Complaint alleges a number of actions by the Defendants that cannot be said to relate to a review action. For instance, the Complaint alleges that notice of the Plaintiff's suspension was leaked to the local press and that agents of the Hospital told Plaintiff's patients that he was "not a good physician." Complaint, ¶¶ 83, 108. The Court must conclude that the Defendants have failed to carry their initial burden of demonstrating that no genuine issues of material fact exist as to whether all of the Plaintiff's claims in Count Five "relate to" the review actions, such as to provide the Defendants with an immunity from damages. That said, the Court concludes that the Defendants are entitled to an immunity from damages for any claims based on activities that relate to a "professional review action." Plaintiff will, however, be able to collect damages on this Count to the extent it relates to other activities by the Defendants.

Count Eight claims that the "adverse publicity" generated by the review actions caused the loss of certain business opportunities. Complaint, ¶ 162. Although this claim, in some ways, seems to be plainly encompassed within the grant of immunity in section 11111(a), the Court cannot, at this stage of the litigation, conclude that this is so. Rather, just as with Count Five, the Defendants have failed to demonstrate the absence of genuine issues of material fact as to whether the entire evidentiary basis for Count Eight "relates to" a professional review action. Leaking confidential review information to the press is not self-evidently a privileged action under the HCQIA. *See* 42 U.S.C. § 11151(10) (defining "professional review activity" and not including the leaking of information to the press within the definition). The Court concludes, therefore, that the Plaintiff may still seek damages under Count Eight, but only to the extent that the

challenged actions by the Defendants do not "relate to" professional review actions or activities.

Count Six of the Complaint alleges a cause of action for defamation, in violation of Ohio law. Plaintiff does not allege that he was defamed in front of the Executive Committee, or otherwise in the course of the review actions themselves. Rather, he claims that agents of the Defendant Hospital posted notices throughout the Hospital announcing that the Plaintiff's privileges had been restricted, after the April 9 meeting.[10] Complaint, ¶ 153. Plaintiff also claims that agents of the Hospital told Plaintiff's patients that he was not a good doctor. *Id.,* ¶ 154. Neither of these alleged acts of defamation is self-evidently "related to" a professional review action. To the extent that the Defendants can prove that these actions are "related to" a review action, then the Plaintiff will be precluded from recovering damages. Otherwise, the immunity provided by the HCQIA does not stand as a bar to the Plaintiff's recovery of damages under Count Six.

■ Moreover, except as to Counts Three and Seven, the Defendants are not entitled to a summary judgment in regard to the requested injunctive relief. Plaintiff asks for a permanent injunction preventing the Defendants from retaliating against the Plaintiff. *See* Complaint at ¶ 166. He also asks for a "permanent injunction enjoining Defendants from engaging in unfair, deceptive, and unconscionable acts and practices against the Plaintiff." *Id.* at Prayer Number 2. As set forth previously, section 11111(a) provides only for an immunity from damages liability. Accordingly, the Court must overrule the Defendants' Motion for Summary Judgment (Doc. # 77), to the extent it may be read to seek a summary judgment on the issue of the requested injunctive relief, except in regard to Counts Three and Seven.

## VII. *Plaintiff's Motion for Additional Time to Conduct Discovery Pursuant to Rule 56(f) (Doc. # 85)*

The Plaintiff initiated this suit with the filing of his Complaint on May 13, 1993 (Doc. # 1). The initial discovery deadline was set for August 8, 1994 (Doc. # 5). The parties subsequently filed a Joint Motion to Revise Preliminary Pretrial Conference Order (Doc. # 25), in which they asked the Court to extend the discovery deadline. The Court sustained the Motion by Notation Order on October 3, 1994. Two days later, the Court entered an Order setting the discovery deadline for April 10, 1995 (Doc. # 27). This deadline did not work either, and the Court set a new date, March 1, 1996, to serve as the deadline for discovery in the case (Docs. # 36 and # 37).

On January 3, 1996, the Court directed counsel to submit a joint Case Management Plan within 20 days (Doc. # 49). This Plan would indicate, *inter alia,* the issues about which discovery was required, the procedural devices to be employed in that discovery, the timing and sequencing of same, and an indication of when the discovery would be completed and the case ready for trial (*id.*). The Plan was filed on March 5, 1996 (Doc. # 52). Therein, the parties indicated that Plaintiff would complete his discovery by November 30, 1996, and that Defendants would complete their discovery by February 1, 1997 (*id.* at 7). The Court thereupon reset the discovery deadline for February 17, 1997 (Doc. # 54). However, the parties were engaged in significant discovery disputes and this deadline did not prove workable. *See* Docs. # 61 and # 68 (Decisions addressing the issues in contention). Accordingly, the Court reset the discovery deadline until

---

**10.** Of course, the veracity of a particular statement is a defense to a claim of defamation under Ohio law. *See* Rev.Code § 2739.02 ("Proof of the truth [of the matter charged] shall be a complete defense."); *Ed Schory & Sons, Inc. v. Society Nat'l Bank,* 75 Ohio St.3d 433, 445, 662 N.E.2d 1074, 1083–84 (1996).

July 25, 1997 (Doc. # 67), and then reset it until April 3, 1998 (Doc. # 70).

On November 25, 1997, the Defendants filed their Motion for Summary Judgment (Doc. # 77). On December 16, 1997, Plaintiff was granted a ten-day extension in which to file a response (Doc. # 81). On December 24, 1997, Plaintiff filed a Motion for an Extension of Time in Which to File Response to Defendant's Motion for Summary Judgment (Doc. # 82). Therein, Plaintiff's Counsel explained that "I have prior commitments and the issues raised in the Defendants' Motion for Summary Judgment are quite complex." (id. at ¶ 8 of attached affidavit). Plaintiff did not at that time—one month after the filing of the Defendants' Motion—state that any additional discovery would be required. The Court sustained the Plaintiff's Motion by Notation Order on December 29, 1997, and allowed the Plaintiff until January 25, 1998, to file his response to the Defendants' Motion. At the Plaintiff's request, the Court then permitted Plaintiff an additional extension, until February 2, 1998, in which to respond to the Defendants' Motion. Plaintiff filed his Memorandum in Opposition (Doc. # 87) on February 5, 1998.

At the same time that he filed his Memorandum in Opposition, Plaintiff also filed a Motion for Additional Time to Conduct Discovery Pursuant to Rule 56(f) (Doc. # 85). Plaintiff's Counsel explained in his attached affidavit that the additional time is needed so that he may obtain discovery which will support the legal claims he asserted in his Complaint (Affidavit of Firooz T. Namei at ¶¶ 8–12 (attached to Doc. # 85)). Plaintiff's Counsel claims that the discovery is needed for four purposes. *First*, he believes it will prove that the medical review action taken against Plaintiff was not taken in the reasonable belief that it was warranted because the Defendants had already decided that Plaintiff did not pose an immediate danger to patients except those in the CCU (id. at ¶ 12). *Second*, he claims it will show that

the Defendants did not take "reasonable efforts" to ascertain the facts (id.). *Third*, he claims it will prove that the Defendants disregarded the advice of their own experts, who did not believe that Plaintiff deserved to be removed for his actions (id.). *Fourth*, he asserts that the to be discovered evidence would show that the Defendants' actions were taken in bad faith, and were substantially motivated by their economic interests (id.).

▮ The Defendants oppose the extension of time. They argue that the Motion is untimely. The Plaintiff's Motion was filed over four years after Plaintiff filed his Complaint, and was filed over two months after the Defendants had filed their Motion for Summary Judgment. They argue further that the evidence the Plaintiff seeks to discover is irrelevant to the issues presented by the Motion for Summary Judgment, which seeks an immunity from damages because of the HCQIA. Defendants appear to concede that the requested evidence might be relevant to the merits of the Plaintiff's claims in this lawsuit, but they argue that the merits of these claims are simply not relevant here, because the applicability of the HCQIA does not turn upon the merits of the underlying claims.

Rule 56(f) grants a District Court the discretionary power to delay ruling upon a motion for summary judgment, "[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition." Fed.R.Civ.P. 56(f). In presenting such a motion, the party must file an affidavit for the purpose of demonstrating how the requested extension of time will enable the party to obtain evidence needed to defeat the motion for summary judgment.

The Court concludes that the Plaintiff is not entitled to the requested extension and must overrule his Motion seeking the same. *First*, the Motion is untimely. The Plaintiff has had several years in which to

obtain the requested discovery. Moreover, the Plaintiff had over two months after the Defendants filed their Motion for Summary Judgment in which to seek the requested evidence. Finally, in the months since the Plaintiff filed his Memorandum in Opposition in February, he has not sought to supplement the evidentiary record. This is despite the fact that the discovery deadline expired in April (two months after he filed the instant Motion and his Memorandum in Opposition to the Defendants' Motion for Summary Judgment), giving him the opportunity to conduct some additional discovery if he had wished to do so.

The Plaintiff's explanation for the untimeliness—that the Defendant did not turn over certain evidence—is unpersuasive. It is certainly true that the parties to this case engaged in a protracted discovery battle, but that does not excuse the Plaintiff's obligation to present a defense to the Defendants' Motion for Summary Judgment. Since the filing of the Defendants' Motion in November, 1997, the Plaintiff has not sought *any* order from this Court compelling the Defendants to turn over *any* documents. Rule 56(f) is not a substitute for the diligent pursuit of discovery. As the Sixth Circuit has stated, "[c]ourts, like the Deity, help those who help themselves." *Dukes v. Bolden,* 1992 WL 51471 (6th Cir.1992) (unpublished) (quoted source omitted). "Although a district court should generally apply Rule 56(f) liberally, the court need not employ the rule to spare litigants from their own lack of diligence." *Id.*

*Second,* with respect to the evidence going to the "bad faith" of the Defendants, *see* paragraph 12(4) of Counsel's affidavit, the Court has determined that such evidence is irrelevant. Accordingly, any additional discovery on this topic would not help the Plaintiff to demonstrate the existence of any genuine issues of material fact regarding the issue of HCQIA immunity.

*Third,* the Plaintiff claims to want discovery regarding the Defendants' alleged decision to disregard the opinion of their own experts regarding the quality of the Plaintiff's care of patients Sale and Martz. *See* Counsel's affidavit at ¶ 12(3). Such evidence will not help the Plaintiff because there is no dispute that the Defendants did not receive the information from these experts until after the review actions on April 9, April 13, and April 20, 1992. The only event that occurred after the receipt of the information was the decision to reinstate the Plaintiff's privileges. Accordingly, the requested discovery could not help the Plaintiff to defend against the Motion for Summary Judgment.

*Fourth,* the Plaintiff's Counsel asserts that certain discovery—regarding the Defendants' allegedly more favorable treatment of other doctors who have smaller practices—has never been produced to the Plaintiff. Counsel testifies that such discovery was ordered by the Court in September, 1997. *See* Decision and Entry of September 8, 1997, at 19 (Doc. # 68). The Court, at that time, did order the Defendants to produce documents in satisfaction of certain requests by the Plaintiff, including the personnel files of the Defendant doctors, as well as all documents "involving any review ... of the treatment of any patient or any treatment rendered by" Defendants Urbanc, Stark, Edwards, or Montana. The Court refused to compel an answer to an Interrogatory seeking information about the file of a Dr. Paulus, on the grounds that the request was overly broad. *See* Decision and Entry of March 18, 1997, at 26 (Doc. # 61). The Court did state that the Plaintiff could thereafter serve an amended Interrogatory seeking information about Dr. Paulus, but one which was narrowed. There is no indication that any such amended Interrogatory was ever served.[11]

---

11. On September 30, 1997, the Court issued an Entry indicating that the Defendants intended to file a Motion seeking to prevent the release of "certain peer review records," on the grounds that the disclosure of such records was not permitted by provisions of the

.As stated previously, a party may not claim the right to an extension of time under Rule 56(f), by claiming that the opposing party has not cooperated with discovery requests. The remedy for a party that has not complied with requests for discovery is a motion to compel or a motion for a finding of contempt. The Plaintiff did not file any such motion after the Court ordered the production of this evidence. The Plaintiff did not file any such motion upon the Defendants' filing of their Motion for Summary Judgment. In fact, no such motion has ever been filed. A motion under Rule 56(f) is not the equivalent of a motion to compel. *See Schaffer v. A.O. Smith Harvestore Products,* 74 F.3d 722, 731–32 (6th Cir.1996) (affirming denial of request for extension under Rule 56(f) where non-movant claimed obstinance in discovery). Accordingly, the Court must conclude that the Plaintiff's assertion that the Defendants have not cooperated does not serve to entitle the Plaintiff to an extension of time in which to answer the Motion for Summary Judgment.

*Fifth,* the Plaintiff's Counsel also believes that additional discovery into documents possessed by the Defendants will address the issue of "reasonable belief" contained within sections 11112(a)(1) and 11112(a)(4), and will show that such belief was lacking. The Plaintiff does not explain to the Court what types of documents he might be looking for. Rather, there is simply a conclusory assertion that additional discovery will cure this evidentiary defect in his case. This is insufficient to warrant any delay on the resolution of the Defendants' Motion for Summary Judgment. *See Simmons Oil Corp. v. Tesoro Petroleum Corp.,* 86 F.3d 1138, 1144 (Fed.Cir.1996) (insufficient to assert that "something will turn up").

HCQIA (Doc. # 69). The Entry recited that the Defendants had until early November to file such a Motion (*id.*). As is revealed from the docket sheet, no such Motion was ever filed. The Defendants' Motion for Summary Judgment (Doc. # 77), does not, at any place,

*Sixth,* Counsel testifies that these documents will show that the Defendants did not look at the charts, did not talk to relevant personnel, and that they disregarded the opinions of two doctors. As stated in the preceding paragraph, a Rule 56(f) affidavit must state generally what kind of documents are being sought. It is insufficient to merely parrot the language of the statute and claim that the additional discovery will be helpful. In addition, the Plaintiff's Counsel does not explain why he did not seek to compel the depositions of the Defendant doctors before the expiration of the discovery deadline. Moreover, with respect to the two doctors whose opinions were allegedly disregarded, Counsel has not explained why he has not taken their deposition or obtained an affidavit from them.

For the reasons set forth above, the Court concludes that the Plaintiff's Motion for Additional Time to Conduct Discovery Pursuant to Rule 56(f) (Doc. # 85) must be overruled.

FOR THE FOREGOING REASONS, Defendants' Motion for Summary Judgment (Doc. # 77) is SUSTAINED IN PART and OVERRULED IN PART.

Said Motion is SUSTAINED in regard to Count Three and Count Seven.

Said Motion is SUSTAINED in regard to the Plaintiff's claims for damages contained within Count One, Count Five, Count Six, and Count Eight, to the extent that said claims are premised on activities relating to the various professional review actions.

Said Motion is SUSTAINED in regard to the claim for damages contained within Count Four, to the extent said claim arises under Article I, Section 16 of the Ohio Constitution.

discuss any peer-review privilege provided by the HCQIA. Accordingly, the Plaintiff cannot rely upon this proposed Motion as a basis for his failure to seek the Court's cooperation in obtaining these documents.

Said Motion is OVERRULED in regard to the Plaintiff's claim for injunctive relief, except to the extent such claim arises under Count Three and Count Seven.

Said Motion is also OVERRULED in regard to the federal constitutional claims contained within Count Two and Count Four.

Said Motion is also OVERRULED in regard to the Plaintiff's claims for damages in Count One, Count Five, Count Six, and Count Eight, to the extent said claims do not relate to any professional review actions.

The Plaintiff's Motion for Additional Time to Conduct Discovery Pursuant to Rule 56(f) (Doc. # 85) is OVERRULED.

Currently remaining viable are the following claims: Count One, but only to the extent that the overt acts do not relate to any of the professional review activities taken by the Defendants; Count Two, in its entirety; Count Four, except to the extent it arises under Article I, Section 16 of the Ohio Constitution;[12] Count Five, to the extent it involves actions that do not relate to the professional review activities of the Defendants; Count Six, to the extent it involves actions that do not relate to professional review activities of the Defendants; and Count Eight, to the extent it involves actions that do not relate to the professional review activities of the Defendants.

Counsel listed below will take note that a conference call will be had, beginning at 8:30 a.m., Wednesday, October 7, 1998, for the purpose of setting a trial date and other dates leading to the resolution of this litigation, and for the purpose of determining further procedures to be followed in identifying and narrowing the remaining issues included herein.

Counsel for the Plaintiff should be prepared to submit to the Court and counsel, not later than Tuesday, October 6, 1998, both a detailed recitation of those activities, encompassed within Counts One, Five, Six and Eight, which he claims are unrelated to the professional review activities of the Defendants and a statement on which of the remaining counts he seeks injunctive relief.

---

12. With regard to that aspect of Count Four arising out of the Ohio Constitution, said claim is viable only as to any claim by Plaintiff for injunctive relief.